297 So.2d 272 (1974)
INTERNATIONAL HARVESTER CREDIT CORPORATION, Plaintiff-Appellee,
v.
Robert E. McGILL, Defendant-Third Party Plaintiff-Appellant,
v.
INTERNATIONAL HARVESTER COMPANY and Rabalais Truck & Tractor Company, Inc., Third Party Defendants-Appellees.
No. 4614.
Court of Appeal of Louisiana, Third Circuit.
June 28, 1974.
Rehearing Denied July 26, 1974.
Writ Refused October 4, 1974.
*273 J. Harry Henderson, Jr., of Guste, Barnett & Colomb, New Orleans, for defendant-appellant.
Edwin L. LaFargue, Ben C. Bennett, Jr., Marksville, for plaintiff-appellee.
Before HOOD, CULPEPPER and MILLER, JJ.
MILLER, Judge.
Defendant Robert E. McGill appeals from the trial court judgment awarding plaintiff International Harvester Credit Corporation the $100,000 + balance due on McGill's note and chattel mortgage, together with interest and attorney's fees. The judgment also rejected McGill's third party demands at his costs. We affirm.
After a four day trial, the trial judge assigned written reasons rejecting McGill's contention that the tractors and equipment delivered on or before April 10, 1970 contained redhibitory vices. He found that McGill's maintenance problems were caused by abuse of the tractors and equipment. While the evidence is not uniformly to this effect, there is ample support for the trial court's factual determination. Absent manifest error, the trial court's finding of fact will be affirmed. Rosenthal v. Gauthier, 224 La. 341, 69 So. 2d 367 (1953).
Appellant specified six errors, the first five of which contend that the trial court's factual determination is manifestly erroneous. The last contention is that the trial court erred in awarding exorbitant attorney fees.
McGill owned some 12,000 acres of land in Avoyelles Parish and planted from 6,000 to 8,000 acres for the 1970 crop year. The land was classified as recently cleared *274 hardwood lowland of a heavy blue clay type on which stumps, holes, and boggy sloughs were to be found. When the soil is dry it is almost like rock; when wet it is heavy and sticky.
Aside from the tractors and equipment secured by the note at issue, McGill owned some twenty tractors, three bulldozers, a dragline, a motor patrol and numerous cultivators, combines, disk harrows, plows, etc. He employed 25 to 35 men to operate this equipment and there was a fairly rapid turnover in employees. McGill maintained and staffed his own repair shop and parts department. His equipment cost some $750,000 and his parts department stocked some $30,000 to $90,000 worth of parts. He had a foreman for each five tractor drivers and a supervisor, Mr. Leroy Griffith, for the overall operation.
In February of 1970, McGill ordered:
4 New International F1456 D Tractors (Large)
4 New International 480 20' 6" Wing type Discs
4 New International 55 Chisel Plows
6 New International 6 Row 186 Planters
3 New Chattanooga 13' Mulchers
3 New 6 Row Units for 186 Planters.
The equipment was delivered before April 10, 1970 when the one year warranty period was commenced. During that year of warranty there were twenty-one claims filed under the tractor warranty and no claims filed on the equipment. Every claim was adjusted. No complaint was made to the effect that the dealer, third party defendant Rabalais Truck & Tractor Company, Inc., failed or refused to service the tractors or equipment.
McGill was unable to present records to substantiate the claims of some twenty of his tractor drivers, equipment operators, foremen, mechanics, etc., concerning repairs and down time on the above listed equipment. McGill's supervisor Griffith was fired in 1971 and took all records with him.
McGill's employees testified that the tractors were not suited for the work. To prevent excessive slippage of the rear drive wheels which provided the power, water was added to the four rear tires as ballast to give more traction. This caused the front end to raise. Weights were added to the front to keep the front end down which in turn caused problems with the front wheels and the steering. Brake problems, steering problems, clutch problems, seat problems, seal problems, transmission problems, and drive train problems were encountered.
Some employees erroneously testified that two axles on the tractors were broken. It was conclusively established that this was incorrect. The most serious problem was with the "bull pinion shafts". Seven of these were broken during the first year. International sent experts down to study the problem and to observe McGill's operations. Weather prevented work during these periods and McGill's employees did not avail themselves of International's offer to observe the equipment while it was in operation.
Of over 400 similar units sold in this five state area, only seven other "bull pinion shafts" were broken. International's expert testimony was convincing that the shafts were up to specifications and the specifications were sufficient for the equipment. Although McGill's employees testified that they never saw the tractors or equipment abused, almost all stated that many tractor drivers were "run off" the job for "cowboying" the equipment. It was established that these tractors were frequently bogged down and had to be pulled out; that attempts were made to rock bogged tractors by quickly changing from forward to reverse gear; that one operator tried to move his stuck tractor by jerking the clutch causing the tractor to jump up and down because it could not move forward; that McGill's employees did not follow International's request to remove water ballast from the outside wheel of the dual rear wheels; that on three of *275 the tractors someone removed the wire seal which prevents overspeeding the engine and allows excessive horsepower to be generated; that not one of McGill's tractor drivers or mechanics checked or knew what was contained in the operator's manual provided with each tractor; and that these "factors" combined to establish that the tractors had been abused. It was in effect admitted that, if abused, all equipment can be broken.
As against the conclusion of McGill's employees that the tractors stayed in the shop most of the time, it was established that each of the four tractors had in excess of 1,000 hours on the recording tachometer at the end of one year. There is no evidence to counter the statements by experts for both sides that the average farm tractor is operated 800 hours per year.
Rabalais' service records were introduced in evidence and show that all twenty-one complaints were repaired under the warranty terms when and as reported. The delays occasioned by the repairs appeared reasonable, particularly considering the abuse suffered by the equipment.
Although the trial judge did not specifically refer to the experience of McGill's neighbor, Darrel Paul Dauzat, we are impressed by the fact that Dauzat farmed 500 acres of land adjacent to and similar to McGill's land. He used identical equipment purchased at or about the time of McGill's purchase and did not have a single warranty claim on his tractor.
McGill failed to establish that the equipment was substandard and that he should have the sale rescinded or the price reduced. The trial court's conclusion is supported in the record.
McGill next contends that eight percent interest cannot be allowed since it was not provided in the note. Alternatively he contends that the interest rate is usurious and thus all interest must be forfeited. It is argued that the unearned capitalized interest cannot be collected when the holder of the note accelerates its maturity. We reject these contentions.
The chattel mortgage shows a purchase price of $77,453.92. To that amount was added sales tax and finance charges totalling $25,611.57, making the note total $103,065.49. The annual percentage rate for interest charges was stated to be 15.5 percent. The note provided for payment in four annual installments, and the chattel mortgage contained the usual acceleration clause. It provided that after maturity each installment shall draw interest at the rate of eight percent.
The judgment awarded plaintiff $102,103.30 after allowing credit of $962.19 for equipment damaged in shipment. This credit was applied on the first installment. Interest at 8% per annum was allowed on the balance due on the first installment from its February 10, 1971 due date and 8% per annum interest was allowed on the remaining installments from judicial demand.
The trial court properly concluded that McGill as mortgagor contracted to pay 8% per annum interest on each installment from maturity. The first installment matured when McGill failed to pay the February 10, 1971 installment, and under the acceleration clause the remaining installments matured at judicial demand.
The remaining arguments concerning interest, in effect, contend that the interest rates are usurious and are thus forfeited under the provisions of LSA-C.C. art. 2924 and LSA-R.S. 9:3501. This argument was rejected in General Securities Co. v. Jumonville, 216 La. 681, 44 So.2d 702 (1950). It was there held that a note containing capitalized interest (or one acquired at a discount) comes within the exception contained in LSA-C.C. art. 2924, and if it does not bear more than 8% interest after maturity, it cannot be said to carry usurious interest. See also Thrift Funds of Baton Rouge, Inc. v. Jones, 274 *276 So.2d 150 (La.1973). The interest charges were not usurious.
McGill finally contends that the $25,000 awarded as attorney fees is unconscionable in light of his bona fide dispute. He argues that the suit did not arise out of his arbitrary refusal to pay or from an inability to pay. We agree with the trial court's conclusion that payee is entitled to enforce the specific provision in the note calling for attorney's fees "in the event it becomes necessary to place this note... in the hands of an attorney for collection or suit...."
The trial court judgment is affirmed at appellant's costs.
Affirmed.